Very funny! The next case is Cayman Foods and the Catholic University of America against Pigmentos Vegetales del Centro. Which one do you wish to argue first? Number 05-1479? Yes, Your Honor. Okay, we'll proceed with that one. Mr. D? Thank the Court. As the Court knows, there are a number of issues involved in this appeal and cross-appeal. I'd like to begin with the District Court's ruling that the 714 patent is enforceable. The District Court found that the undisclosed poultry science article, which is how everybody refers to it here, was material and was withheld from the Patent Office with intent to deceive. The District Court, nevertheless, assigned very low weight to both the materiality and the intent in the weighing portion of the analysis and found that there was no inequitable conduct. The poultry science article, however, is highly material. And although we think that the level of intent is also very high, I would suggest that the Court's analysis of this, that the easiest way to go is to determine that the poultry science article is, in fact, highly material and that the District Court abused its discretion in finding no inequitable conduct. There is no question on this record that the patentee was intimately familiar with the poultry science article. The poultry science article is highly material, Your Honor, for a number of reasons, but two primary reasons. The first is that it is more relevant than any of the prior art disclosed in the 714 patent. Indeed, this Court made a reference to that in its opinion on the preliminary injunction when we were here previously two years ago. There is no prior art disclosed in the 714 that discloses 99.2% pure lutein like the poultry science article does. Second of all, the District Court found in its materiality analysis that all three limitations of Claim 1 of the 714 are present in the poultry science article. The District Court also said that the stated purpose of the 714 patent and the goal of the poultry science article overlapped and were the same in that both were trying to obtain purified lutein for analytical standards. Now, I suggest that that alone is enough for this Court to find that the poultry science article is highly material. It was already found to be highly material, so do concentrate on the discretion aspect exercised by the trial judge. The District Court found that the poultry science article was of low materiality based on the fact that he believed, and I believe his language, Your Honor, was there was little persuasive record evidence that the poultry science article could be replicated, could be duplicated. And there was an issue of the enablement, if we could borrow that from the anticipation analysis of the poultry science article throughout the trial. What the District Court did, Your Honor, was it took the conflicting evidence about whether or not the poultry science article could be replicated. The record, as an aside, indicates that Kemen worked with the poultry science article in its labs for years. They had the method before it was published. Both Kemen and its president, Dr. Nelson, are identified in the poultry science article as contributors to the research described in the article. The District Court took all of the indications of materiality and essentially offset them with the fact that it found little evidence that the article itself could be replicated. There was conflicting evidence at trial, both sides. Kemen said they couldn't get it to work. We say they did, and this is all in the record, that there are lab reports that indicate it worked inconsistently, but that when it worked, they got over 98% pure lutein. The Court's abuse of discretion in finding low materiality of the poultry science article is in the fact that it simply took that one factor and allowed it to outweigh the fact that all three limitations of Claim 1 are present in the article, that no other prior art disclosed in the patent is more relevant than the poultry science article, that Kemen had worked with it in its lab for years and years trying to make it work on a commercial basis. In addition, Your Honor, and I think significantly, a year later when Kemen applied for the 564 patent application, they disclosed, first of all, the poultry science article as prior art in the 564 application. More importantly, in the specification of the 564, they have a site for which the poultry science article and the 714 patent are the authority. The site in the 564 specification is that others have previously added appropriate solvents to crystallized lutein from saponified oleoresin. The site for that proposition in the 564 patent is the poultry science article and the 714 patent. That, by the way, is in column 1, lines 62 to 67 of the 564. So, back in 1995, a year after the 714 patent had been applied for, before there was any lawsuit going on, before there was a market for lutein as a nutraceutical, before there were any competitors like Kemen and Pevig here, Kemen is telling the patent office that the poultry science article stands for the proposition that others have crystallized lutein. We think that's the district court's error, and I would suggest to the court that an affirmation of the district court's finding of enforceability of the 714 would create an incentive for future material prior art to withhold it from the patent office because they claim they couldn't get it to work. Therefore, they could someday down the road possibly cite to this case and say, well, look what happened in the Kemen versus Pevig case. You had material prior art, pardon me, you had prior art that had all the limitations of the claim, was more relevant than any other prior art disclosed in the patent, and yet it can still be held, and yet the fact that the patentee says that it couldn't be replicated, that outweighs all of that. With the time I have left, Your Honor, if there aren't any more questions, which I'd be happy to answer, I'd like to move on to one of the other issues on the appeal, which is the enforceability of the 564 patent, the inequitable conduct in that case. We've alleged in our brief, and we've stated that we call it a troubling pattern of conduct, Kemen, in applying for the 564 patent one year after the 714 patent application, withheld highly material information with which there's no question the inventors were intimately familiar. And in that case, the prior art is, pardon me, the material information withheld is that since the early 80s, approximately 1983, Kemen had been using propylene glycol in saponification to produce xanthophyll crystals, specifically lutein. Claim one of the 564 requires the use of propylene glycol in the claim process. And even more significantly, the examiner's reason for allowance on the 564 was that in the absence of a prior art teaching that would motivate one of ordinary skill in the art to use propylene glycol in producing xanthophyll crystals, the 564 application is allowed. Kemen had been doing exactly that for over 10 years, using propylene glycol to produce xanthophyll crystals, and they never disclosed it. They were using it for a commercial. You're saying that they had to disclose their own activity, which was not published. It was not published, but it was a process they used for a commercial product that they had been selling for over 12 years. The commercial products for the court's reference are what's referred to as Kemen Yellow and Oroglow. There's a different product. Pardon me? It was not this product of this purity, right? The Kemen Yellow and the Oroglow are not the product of the 564 process. Correct, if that was your question. The Kemen Yellow and the Oroglow had been sold by Kemen since the early 80s. There's a good description of those two products in the appendix at pages 4897 to 4902, but Kemen Yellow and Oroglow are the product of saponifying oleoresin with propylene glycol. The 564 patent is a saponification process using tremendously increased amounts of propylene glycol, much more so than Kemen had been using for the 12 years. But that's not the invention that's covered in the patents in suit, is it? Which? The use of propylene glycol? I'm trying to understand. I mean, these are very interesting questions, but I'm trying to understand the point at which, let's say, a chemical producer or manufacturer is required to call upon proprietary unpublished information that it uses in other processes, bring it to the attention of the patent office, if in fact it would not be prior art, or at least if there is an arguable basis for concluding that it's not prior art. A couple of answers to that, Your Honor. First of all, Rule 56 is not limited just to prior art. It's limited to any information that would be material to patentability. But the reason I mentioned prior art is, would it in fact be material? And if in fact there is a reason for believing that it's not material, somewhere along the way there needs to be flexibility for what our cases call a good faith belief in an applicant taking a position in terms of what they bring to the attention of the office and what they don't. And where does one draw this line in terms of the internal knowledge of a producer? Well, I'm not sure that I could give the Court a hard and fast place at which a line can be drawn as to when a patentee should disclose an ongoing process that it uses that would be material, prior art. In this particular case, however, we have an unequivocal statement from the patent examiner and its reasons for allowance that there is nothing else out there that involves the use of propylene glycol to produce xanthophyll crystals. In this particular case, not only was it not disclosed when the application was filed, but even if at that point, Your Honor, if we give the inventors the benefit of the doubt for the moment and that they had subjective good faith to believe that it was not material information that they needed to disclose, when the patent examiner issued its reason for allowance, that the reason he was allowing the patent was that there was no record anywhere that previously anyone had used propylene glycol to produce xanthophyll crystals. At that point, at an absolute minimum, the inventors had to know that that was material information and there would be no subjective good belief. But you don't say that that information was public or publicly available through any of the 102 sources. It was information known only to the applicant because of another process. And that's where I'm trying to understand what burdens or opportunities or whatever you want to call it. Well, it has to be on a case-by-case basis, but I believe that trade secrets, a patentee's trade secrets that could be material to a patent application are also not exempt from disclosure if, you know, once you get into the whole analysis of materiality in Rule 56. It's hard, Your Honor, I just, I don't know that, pardon me. Well, I'm really just thinking, to require a trade secret to be put on the public record, that's what you're saying, that the law requires, so requires. Maybe it does, but the real question is whether here, if judgment was to be exercised, the penalty is to be imposed of saying the district court did not have discretion to excuse or minimize. I think that's probably the question with every inequitable conduct case to certain degrees, isn't it? Yes, indeed. Whether or not the patentee exercised, whether the patentee, if you will, exercised the proper discretion in making the decision initially not to disclose something. Well, let's save the rest of your rebuttal time on this issue, and let's hear from the other side. Thank you, Your Honor. May it please the Court. Yes, Your Honor. I'd like to start with the issue that you raised, Judge Newman, with respect to the discretion. And in this instance, the district court did not abuse its discretion in finding the 714 patent enforceable. In fact, the district court followed this court's precedent, as it very much was required to do so. It made the necessary underlying factual findings, assessing the credibility of the witnesses, and came to the conclusion that while there may have been material, it was low materiality on the 714 patent, and while there was maybe a marginal amount of evidence that could have supported the advisory jury finding that there was intent, upon assessing the credibility of the witness, and the particular witness that was accused of inequitable conduct in this case, Dr. Nelson, is that the court made the conclusion, based upon all of the evidence that was presented to him, as the fact finder, that there was no intent to deceive the patent office. There was very low intent. And when he did the balancing, because he did find that there was a marginal amount of intent, if any, and then he did the balancing between low materiality and very low intent to come to the correct conclusion that there was no inequitable conduct in connection with the 714 patent. And PIVBG has not pointed to any error by the district court in that regard. In fact, if you go to the district court's decision in A103, the district court outlines every one of the arguments, or addresses, in essence, every one of the arguments that were being made here. And what is happening here, again, is that PIVBG is simply re-arguing the facts that the district court heard and rejected at trial. The same with the inequitable conduct on the 564 patent. The district court in that regard found that there was a dearth of evidence of any materiality or any intent on the part of the inventors in that patent. And so on that basis, he didn't have to go forward to do the balancing because he found no materiality. And the reason he found no materiality is because the record in front of the jury and in front of everybody else was that there was no recognition by anybody in the art that propylene glycol had any meaningful effect when making those old products, the Kevin Yellow and the Oral Glow. So there was no recognition by anybody skilled in the art what was going on there. So they couldn't have recognized it. It's impossible to recognize it as material. And on that basis, the court found that there was just no inequitable conduct could be found on the 564 patent. Now returning to the argument that was made about how the poultry science article anticipated the claims, the district court has made it clear in its opinions and its analysis that this poultry science article does not anticipate the 714 claims. In fact, the jury found, after all the evidence that Mr. D. re-argued here, the jury found that this poultry science article did not anticipate the claims as properly construed. And PIVOT has not appealed that verdict. So as it stands right now, there is no way for the district court to have concluded that the poultry science article anticipated the 714 claims. That's just incorrect. The district court couldn't make a finding on the inequitable conduct portion that was inconsistent with his support of the jury verdict on anticipation. Now, in looking at the role of the district court in this instance, he did not make any clear error of fact-finding. Everything that he made was supported by substantial evidence in the record. You adverted to this earlier, but I'm puzzled by some of the language that the district court used with specific reference to the issue of intent. One comes away from the district court's opinion saying that he was perhaps not entirely in agreement with the advisory jury's conclusions, but wasn't going to walk away from those conclusions. What would your assessment or characterization of the district judge's finding on the issue of intent be? If you look at the history of these proceedings, this is the third time. I'm talking about the 714. The 714 patent. This is the third time that this district court judge was presented with the issue of inequitable conduct in the 714 patent. It was first presented with it on the preliminary injunction motion, and on the preliminary injunction, he found no intent to deceive. He wasn't persuaded that there was clear and convincing evidence of an intent to deceive. It then comes back in the course of summary judgment filings and files another summary judgment that all the patents are inequitably obtained. The district court addressed it again in that context and said, no, we'll let this go to the jury. So then the district court, finally, the third time this has all been heard in front of the jury. It was an advisory jury verdict. And the district court, like I said, was responsible for judging the credibility of Dr. Nelson, and that's what he did. And when he looked at the facts of what transpired, he found that Dr. Nelson in fact did know about the culture science article. That was 1989. And then the patent filing was not until 1994. So given the distance in time and the recollection of Dr. Nelson that it didn't work, that they were never successful in getting a pure routine that they could actually use and produce this waxy, sludgy stuff. So he looked at all of the factors of what happened and came to the conclusion that there was no intent to deceive, or a low intent to deceive, excuse me. Right. I'm a little hard-pressed to understand what a low intent to deceive means. I mean, it seems to me intent to deceive is a binary concept. I mean, I either intend to defraud someone or I don't. It's hard for me to get my hands around this concept. It seems to me that the district judge is maybe uncomfortable with but not prepared to disclaim the conclusion reached by the jury, and I'm not sure quite what we're reviewing. No, I think the issue comes back to culpable intent. And I think the court, if you look, he addressed 17 pages in his decision on this court's prior precedent on inequitable conduct. And what he was fighting against in part was the inference upon inference upon inference that PIVB would have this court draw. PIVB has always advocated once you find it's highly material, then it's automatic that there's intent. So I think the district court was trying to reconcile all of this court's prior precedent as to what is culpable intent as compared to just knowing about it and was careless or reckless or grossly negligent. And I think that's what the district court was trying to address with this very low intent, that there was no culpable intent to deceive to create inequitable conduct in this case. So I think that's what the district court was dealing with on that issue. And the jury said there was no intent established. The jury found that there was intent, but there was no jury question as to whether the level of materiality or the level of intent. It's just like the case in Duralast that this court decided where it was basically the same advisory jury verdict where the court is free, the district court is free to make its own findings in view of the fact that it's an advisory jury verdict and that's what the court did in this case. You mentioned gross negligence. Was there any evidence before the jury based on the fact that it was disclosed in the application filed only a year later? They were co-pending? Well, the evidence was that Dr. Nelson was the president of the company by the time the application was prosecuted. And so he didn't have any day-to-day responsibility or activity with respect to the patent prosecution. So by the time, as I mentioned, the district court relied on the fact of the timing from the time he actually dealt with the Poultry Science article in 1989 that how many years had transpired? Six years had transpired and he had progressed to being president of the company and so he wasn't involved in the day-to-day prosecution activities for either patent by that point in time. Was there evidence? Was it explained? How did it get into the record for the second application? Because there were different inventors on the second application. Different inventors or different lawyers? Different inventors and different lawyers, both. So on the second application, the inventors are Osage and Sanders, and then there was a different attorney who did the prosecution of that one. So the evidence at trial was Dr. Kachek, who's the inventor of the 714 patent, never knew about the Poultry Science article until much later after the patent had issued. And so the only person who was accused of inequitable conduct on 714 was Dr. Nelson. So there were two different inventive groups, two different sets of lawyers. So now if I could, I'd like to turn to the matters of our cross-appeal. The Claim 5 issue. Pardon? The Claim 5. The Claim 5 issue where after we have infringement of the 714 patent and then with respect to infringement of the 714 patent, we are appealing that because we think the district court erred in not enforcing its own claim construction. So that the substantial evidence that gets pointed to when this is, oh, there was substantial evidence to support the jury verdict of non-infringement, is not evidence that goes to the correct claim construction. There was a lot of argument at trial, not much evidence, but a lot of argument that no traces means zero, that when you say no traces of toxic chemical, that means zero. And in fact, there was evidence that toxic chemicals means that there's some tolerable limit. I mean, everything can be toxic. Table salt can be toxic if they take it in enough concentration. But the fact of the matter is there had to be some parameters put to that so that when you look at all three claim elements, there was substantial evidence and all of the evidence, when you look at the evidence on equivalence, would suggest that there was infringement under the doctrine of equivalence at least. And finally, I'd like to turn to the issue of the injunction in this case. You don't want to tell us about Claim 5 at all? Are you going to rest on your brief on that? I would like to rest on my brief on that and take my time to address this injunction issue because it is an unusual situation. It's a very unusual situation where the district court, in trying to craft an injunction, having found the imposition of Section 295 and the burden-shifting statute where PIVG had to prove non-infringement because there were no documents to prove what their process was. There was no way after two inspections to determine what their process was. The corporate mandate was don't document our process. Don't tell anyone what it is. And so under the circumstances, the district court correctly applied 295, and it was PIVG's burden to come forward with the evidence to show they did not infringe. Now the verdict found that any and all PIVG processes used up until the time of the verdict infringed at least under the Doctrine of Equivalence. So the district court was left with sort of a dilemma of how do I craft an injunction when it's based upon the absence of evidence? So what we're asking the court to do here is to modify that injunction so that all of PIVG's processes are found to infringe up until the point in time of the jury verdict because otherwise there's no meaningful relief to Kemen. Kemen is the one that prevailed at trial, got money damages, they were found to infringe, but there's effectively no injunction in place. PIVG changed its process. It's tallied in the industry that the injunction has no effect on it. And so we would ask this court to modify the injunction so that it gives Kemen the absolute meaningful relief that the statute is meant to give. Okay, you're saving some rebuttal time on the cross-appeal? Yes, ma'am. Okay. Mr. D? Thank you, Your Honor. Let me expose the nature of rebuttals. It's a little bit scattershot, so I will follow with that trend. A couple of the things that Ms. Knowles said regarding the enforceability issues. First of all, the district court's finding of no materiality and no intent, he made a general reference to the fact that there's a dearth of evidence to support a finding of materiality or intent for the 564. And then he went on to say, therefore, the jury's advisory verdict is supported by substantial evidence. I would suggest to this court that the district court did not engage in independent analysis of materiality and intent on the 564 equitable conduct issue. Second of all, there was an argument about anticipation. We haven't appealed anticipation. We're not arguing to this court that the poultry science article anticipates the 714 Claim 1. But we are here to say what the district court found, which was that as one of his ways of measuring materiality of the poultry science article, he found that all three limitations of Claim 1 are present in that article. With respect to Judge Bryson's question about the district court's intent issue and the analysis, the assessment of that under the 714 issue, the district court found two bases of intent. One was that there had been a two-year lapse since the conclusion of Kemen's lab work on the poultry science article and the filing of the application. But that belies the fact that the prior art that was submitted goes back to the 50s and the 70s and the 80s. There's only one, maybe two, prior art references that were submitted that are as recent as the poultry science article. Okay. And Mr. D., you're out of time. Do you want a moment to comment on the cross-appeal? I do, Your Honor. Thank you for the opportunity. With respect to the argument with the 714 non-infringement, Ms. Knoll misstates the argument that we've been making all along and that we are continuing to make in this court with respect to the third limitation, which is no traces of toxic chemicals. We have said all along, and we argued this to the jury, no traces means no traces. Kemen has argued no traces means some traces, as measured by FDA standards, which is an ongoing and fluid measure that the FDA uses. Our contention is no traces based on the technology available in 1994 when the 714 application was filed for determining traces of toxic chemicals, which, by the way, is in Dr. Kachik's NDA application, which indicates that in 1994 the detection limits for hexane were four to seven parts per million. Okay. Thank you, Mr. D. You've exhausted your time. Thank you, Your Honor. Now, Mr. D. didn't respond very much, but you have some time left on your cross-appeal. Is there anything you need to say in response on the cross-appeal only? Yes, Your Honor, on the cross-appeal only, and this is to come back to the issue of the injunction and the denial of the meaningful relief. And this brings back the thoughts back into the Claim 5 issue that Judge Bryson issued earlier. We were in a difficult situation here where we had no evidence as to what the real process was. There was a one-page process document that was provided that turned out to be not accurate in many respects. And then having done one inspection and went back and did the second inspection, and it was a timely report and it was timely filed and there was going to be no prejudice to PIVIG, Kevin then discovered that there was at least some evidence of infringement of Claim 5 of the 714 patent and then was denied the right to amend and bring that into the case. And we think the district court should— That's really your complaint, isn't it? I mean, it seems to me that the injunction is a sort of backwards way of trying to get at the problem, which is that you didn't get to try your infringement claim, Claim 5, which would have, had there been a finding of infringement with respect to that claim, you would have gotten presumably the injunction you're looking for. Isn't that right? Well, it's in part—they're hand-in-hand, Your Honor, because the injunction— it was very difficult to sit down and even try to direct the district court on how to craft an injunction on 295 because nobody's ever done it. I mean, there's no precedent out there. There was no case authority for the court to follow as to how do we do this. And so it does go hand-in-hand between the denial of being able to assert Claim 5 together with just the language of the injunction itself. And what PIVOT comes back and says, oh, well, you can't have these maxims about general propositions with respect to injunctions, that doesn't solve the particular problem that's at issue here. Okay. Thank you, Ms. Newell.